**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 21-cr-20497-JEM/Becerra

UNITED STATES OF AMERICA,

v.

JORDAN ALEXANDER EWERS,

    Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
**DEFENDANT'S MOTION TO SUPPRESS[1]**

    **THIS CAUSE** came before the Court on Defendant, Jordan Ewers' ("Ewers" or "Defendant"), Motion to Suppress (the "Motion"). ECF No. [18]. The United States of America (the "Government") filed a Response to Defendant's Motion, ECF No. [24]. The Court held an evidentiary hearing on this matter, ECF Nos. [26], [32]. At the hearing, the Parties requested an opportunity to submit supplemental briefing, and the Court granted leave to the Parties to file a supplemental brief as to whether Defendant was in custody during the interrogation. ECF No. [31]. Defendant filed a Post-Hearing Supplemental Brief and Motion for Leave to Expand (the "Supplemental Motion"). ECF No. [33]. The Government filed its Post-Hearing Memorandum of Law in Opposition to Defendant Ewers' Motion to Suppress (the "Supplemental Response"). ECF No. [34]. Upon due consideration of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that Defendant's Motion be **DENIED**.

---

[1] The Honorable Jose E. Martinez, United States District Judge, referred this matter to the undersigned. ECF No. [21].

## I.      BACKGROUND

Defendant is charged with one count of selling child pornography, in violation of Title 18, United States Code, Section 2252(a)(3)(B) and (b)(1).  ECF No. [6].  On September 1, 2021, law enforcement executed a search warrant at the home of Defendant's boyfriend, Anthony Lopez, where Defendant was also staying.   While officers conducted the search, Defendant was interviewed by two federal agents in an unmarked police vehicle.  Defendant made incriminating statements before being read his *Miranda* rights.   After making incriminating statements, Defendant was read his *Miranda* warnings and made additional incriminating statements. Defendant moves to suppress the pre- and post-*Miranda* statements.  *Id.*  ECF No. [18].

## II.      FINDINGS OF FACT

At the evidentiary hearing, the Government called five witnesses: Philip Mederos, Vanessa Juede, Jeanette Oswey, Eric Stowers, and Elizabeth Suarez, and admitted five exhibits into evidence.   Specifically, the Government admitted an audio recording of the interview of Defendant, Govt. Ex. 1, ECF No. [29] at 2, and the transcript of the interview, *id.* at 3–92. Additionally, the Government admitted Defendant's signed *Miranda* waiver, Govt. Ex. 4, *id.* at 93, and "Consent to Assume Online Presence" form, Govt. Ex. 5, *id.* at 94.

Defendant called two witnesses, Jennifer Vazquez and Georgia Torres, occupants of the house on the morning that the warrant was executed.  Defendant also admitted four exhibits: a photograph of a BearCat vehicle, Df. Ex.1, ECF No. [28] at 2, a photograph of the HSI BearCat vehicle outside of the house, Df. Ex. 2, *id.* at 3–4, a photograph of the house, Df. Ex. 4, *id.* at 5, and diagrams of the house, Df. Ex. 5, *id.* at 6, Df. Ex. 5a, *id.* at 7.

## A. The Testimony of Agent Mederos and the Execution of the Search Warrant

On September 1, 2021, at approximately 6:00 a.m., Philip Mederos, an agent with Homeland Security and a member of its Special Response Team (the "SRT"), participated in the execution of the search warrant. According to Agent Mederos, SRT is routinely involved in the execution of warrants concerning child exploitation, due to an increased risk of violence associated with these warrants. Agent Mederos testified that SRT's role is to secure the house and turn the scene over to the agents conducting the investigation.

On the morning that the warrant was executed, agents entered the property through an unsecured perimeter fence. As agents were taking their positions, an individual was encountered at the front door of the residence. As the agents approached, they announced that they were law enforcement and advised the occupants not to move and to show officers their hands. The individual (who was not Defendant) was handcuffed, frisked, and detained outside of the residence. Agents then called into the residence from the open door, announcing law enforcement's presence and their possession of a warrant, and ordering residents to come outside. Similar announcements were made from an armored vehicle outside the house. Agents announced their presence and searched each of three separate efficiencies that were part of the house. Agent Mederos testified that, when necessary, they forced open interior doors of the house. Further, when they encountered a hallway with multiple rooms, a dangerous tactical situation, one of the agents deployed a flash bang.

The occupants of the house were patted down and handcuffed for officers' safety, pending considerations like age and potential injury, until SRT cleared the house of the occupants and turned the scene over to the agents conducting the investigation. Agent Mederos recalled that all adult males, which he believed to be six or seven in total, were handcuffed and searched. After

the occupants came out of the house, many of them were seated, and chairs were brought out for individuals who had difficulty sitting on the ground.  Agent Mederos testified that the children and elderly individuals were not handcuffed, and that it was left to the discretion of the agents who were conducting the investigation to un-cuff the other occupants.  Agent Mederos testified that the occupants were detained and not free to leave while the SRT team was securing and checking the residence.

Agent Mederos testified that there are typically fifteen to twenty SRT agents on scene for the execution of a search warrant.  He also testified that they arrived in an armored vehicle and two to three unmarked vehicles.  Agent Mederos testified that SRT typically does not block the street, as other agents typically take on that role, but the SRT team was in the perimeter of the house.  Agent Mederos testified that SRT agents were wearing their uniforms, which include long-sleeved green shirts, and body armor, helmets, eye protection, gloves, radios, flashlights, and weapons–typically a rifle and handgun–when they executed the search warrant.  After approximately fifteen minutes, SRT handed control of the scene over to the agents investigating the case and departed in the BearCat vehicle.  He did not recall whether a helicopter was present but noted that they are routinely used.

## B. The Testimony of Agent Vanessa Juede, Agent Jeanette Oswey, Jennifer Vazquez, and Georgia Torres and the Scene Outside the House During the Search.

Agent Vanessa Juede and Detective Jeanette Oswey were charged with supervising the occupants of the house while the search warrant was being executed.  After arriving on scene, Agent Juede instructed officers to remove handcuffs from the few individuals that had flex-cuffs and believed that she, personally, removed some.  She testified that all individuals were uncuffed.  To the best of her recollection, there were approximately ten to eleven occupants of the residence.  She testified that the occupants were sitting outside, some on the ground and some in chairs.  Agent

Juede testified that she told the occupants, in both English and Spanish, that they were not under arrest, that the officers had a search warrant, and to tell her if anyone needed to leave. Agent Juede testified that she did not interact with Defendant because she was focused on the women and children. She recalled that Defendant had been handcuffed, but that someone other than her removed the cuffs. Agent Juede testified that the occupants had to sit outside in the designated area for safety reasons, but that they could walk around in the yard, though the yard was small. Agent Juede testified that two or three armed officers were watching the occupants of the house. According to Agent Juede, one man asked to leave but ultimately did not leave.

Agent Juede testified that she did not hold at gunpoint, threaten or yell, nor intimidate the occupants of the house. Agent Juede testified that she was wearing a shirt marked with the letters "HSI," a bulletproof vest, jeans, and a firearm on her waist on the day of the search warrant execution. She recalled that she also had handcuffs, a flashlight, handcuff key, and a flex-cuff cutter, which would have been in her vest pockets and not visible. Agent Juede testified that she believed two marked vehicles were blocking the area so that civilians and cars would not cross the perimeter, and there were other marked and unmarked vehicles around the property. She could not recall the total number of individuals from all agencies but estimated there were fifteen to twenty individuals, all of whom would have been wearing bullet-proof vests. Agent Juede testified that she interviewed female Spanish-speaking occupants in her vehicle. To the best of her recollection, Agent Juede read the women their *Miranda* rights. She also testified that she transported the children to the police department for a forensic interview.

Detective Oswey testified that she was wearing a police shirt with her badge, a bullet-proof vest that said "police," and had her firearm holstered on her side. Detective Oswey testified that Agent Juede explained to them in English and Spanish that an investigation was underway, they

were not under arrest, and they were free to leave.  Detective Oswey testified that Defendant never asked her if he could leave, and she did not hear him ask anyone else if he could leave.  Detective Oswey recalled that Defendant was not handcuffed when she arrived.  He was sitting against the wall of the house.  Detective Oswey testified that she did not point her weapon at anyone, did not threaten anyone, and did not yell at anyone.  According to Detective Oswey, if anyone told her they wanted to leave, she would have "spoken to the case agent and expressed to her, '[t]his person says they need to leave, should I tell them they can leave.'"  ECF No. [32] at 86:5–7.

Defendant presented the testimony of two occupants of the house, Jennifer Vasquez and Georgia Torres.  Ms. Vasquez, Anthony Lopez's sister, testified that she was making breakfast at approximately 5:40 or 5:50 a.m. when she heard her family's dogs barking loudly.  According to Ms. Vasquez, her older brother walked toward the door of the house and poked his head outside when she heard a voice say, "get down on the ground."  *Id.* at 148:9–11.  Ms. Vasquez testified that she then saw two individuals grab her older brother and throw him down to the floor, away from the door.  According to Ms. Vasquez, she went to tell her mother what happened, and when she returned to the hall, she saw someone with flashlights and pointing a gun, telling her to come toward the door.  Ms. Vasquez testified that she did not know at the time that the individuals were police officers, and that they pulled her out of the house by her arm and put her against the shed that was on the side of the house.  She described the tone of the officers' voices as aggressive and said they were pointing their guns toward her.  Ms. Vasquez testified that she was frisked while outside, and that all of the other occupants were also searched.  Ms. Vasquez testified that she saw her older brother on the ground and saw officers frisk him, and she was not sure whether they put handcuffs on him.  Ms. Vasquez testified that she then saw that the back of the house was surrounded by other individuals and then heard an explosion and saw smoke coming from the

house.  She recalled seeing a helicopter and various cars.  Ms. Vasquez testified that she was handcuffed, and that she saw her boyfriend was put in flex-cuffs, but her father was not handcuffed. Ms. Vasquez testified that she saw Defendant outside but did not see him brought outside.  She recalled that Defendant and her boyfriend were both wearing shorts but no shoes or a shirt.

Ms. Vasquez testified that she was not told that she could leave at any point and did not feel like she could leave.  She recalled that, once she was given back her phone, she took a picture and that it was at 11:55 a.m.  According to Ms. Vasquez, the occupants of the house were not initially free to move around in the yard, but then around 11:00 a.m., the occupants were permitted to "do whatever" but said that she thought they could not leave because there were cops and detectives around them and they had to ask to use the restroom.  At one point, Ms. Vasquez had to use the bathroom and was escorted by officers into the house and had to leave the door partially open as she used the bathroom.  Ms. Vasquez testified that her father was not allowed to leave when he asked if he could go to work, nor to go look for one of the family dogs that had run away that morning.  According to Ms. Vasquez, her father asked various times, hours apart, if he could go to work but was told that he had to wait until the officers were finished.  She recalled that officers retrieved clothes and shoes for Defendant and her boyfriend.

Georgia Torres, Anthony Lopez's mother, testified that Defendant was living with the family.  Ms. Torres testified that when her husband opened the bedroom door, someone threw a smoke bomb through the door to her bedroom, where she was with her grandchildren.  According to Ms. Torres, the officers ordered her outside and so she went outside with her grandchildren. She testified that she saw Defendant and Lopez walk out of the house with law enforcement, handcuffed.  She testified that the officers told her where to go and that she was not permitted to

leave during the time that the officers were there, and that she had to ask for permission and was accompanied by an officer when she had to use the restroom.

Although the testimony of the defense witnesses corroborates or is otherwise consistent with the Government's evidence, Agents Juede and Oswey specifically testified that the occupants of the house were told they were free to leave. The Court finds their testimony credible and does not credit the testimony of Ms. Vasquez and Ms. Torres on this issue. Nevertheless, whether they were told they were free to leave or not told anything (as the defense witnesses allege), the analysis of whether Defendant was free to leave, as discussed below, does not rest on this as there is no dispute that Defendant was told he was free to leave by the agents that conducted his interview.

**C. The Testimony of Agents Stowers and Suarez and the Interview with Defendant**

HSI Agent Eric Stowers was at the scene on the morning the search warrant was executed. On that day, Agent Stowers believed that Anthony Lopez, a target of the investigation, lived in the house with his family and that Defendant, who was also linked to another residence and was "in and out of a relationship with Mr. Lopez" would be at the home. *Id.* at 101:18–22. Agent Stowers testified that he was investigating Defendant and Anthony Lopez for selling child pornography on Twitter, and that prior to the execution of the search warrant, had evidence linking both Defendant and Anthony Lopez to the sale of child pornography. Both were considered targets of the investigation that began around March 2021.

Agent Stowers testified that HSI recommended that SRI conduct the entry of the house due to the danger of executing child exploitation warrants, and due to the number of individuals— approximately six to eight adults and two children—living in the house. Agent Stowers testified that all officers on the scene were carrying firearms and wore bulletproof vests or some form of

protection, and that the SRT members wore helmets.  There was also a helicopter overhead that shone lights on the house.

When Agent Stowers arrived, he recalled that the occupants of the home were sitting in the yard.  To the best of his recollection, the males were handcuffed with flex-cuffs.  After speaking with SRT agents, Agent Stowers entered the home to see the layout, where evidence was located, and where the occupants had been before leaving the house.

After his review of the house, Agent Stowers and Agent Suarez walked up to Defendant. The plan was "to attempt a noncustodial interview of [Defendant]."  *Id.* at 126:12–13.  There was a similar plan for Anthony Lopez.  When Agent Stowers and Agent Suarez approached Defendant, Agent Stowers was in plain clothes, as he had taken off his vest with police markings.  Agent Stowers' firearm was in a holster.  Defendant was sitting in the yard and was not in handcuffs. Agent Stowers testified that neither he nor Agent Suarez pointed their firearms at Defendant, touched Defendant, or put handcuffs on Defendant.  Agent Stowers testified that he did not threaten Defendant.  According to Agent Stowers, Defendant's demeanor was calm, although Defendant later said that he was nervous.  Agent Stowers recalled that he said something like, "[w]e wanted to talk to you and would you come with us and sit down with us?" and that Defendant said yes. *Id.* at 108:19–109:1.

Agent Stowers, Agent Suarez, and Defendant walked to Agent Stowers' unmarked government vehicle, a black Jeep Cherokee, which was parked in front of the house.  Neither officer touched Defendant as they walked.  When they arrived at the vehicle, Agent Stowers sat in the driver's seat and told Defendant to sit in the front passenger seat, though Defendant initially tried to go in the back seat.  Agent Suarez sat in the back seat behind Defendant.  There were no emergency lights on the vehicle at that time, and the doors were unlocked.  Agents Stowers and

Suarez began their interview of Defendant in the jeep.  Defendant remained without handcuffs throughout the interview, and the interview was recorded.  While Agents Stowers and Suarez interviewed Defendant, agents were still inside the house, as well as outside of the house with the other occupants.  The entire interview lasted approximately two hours.[2]  *See* ECF No. [29] at 2.

At the beginning of the interview, Agent Stowers advised Defendant as follows:

> So just relax.  You're not under arrest, okay?  You're not under arrest.  You don't have to answer questions if you don't want to. You're free to leave whenever you want to, okay?  Um, you can answer questions you want to, or you can say, "Hey, I don't want to answer that," and we'll keep it moving, okay?  Um, we're conducting an investigation about stuff on the Internet, okay?  You know what a IP address is?

*Id.* at 4.  Agent Stowers testified that the questions he asked Defendant thereafter were intended to elicit information about the case, including questions about his internet and social media usage that implicated him in the sale of child pornography.  As to the tone of the interview, the agents did not raise their voices and at various points checked to see whether Defendant needed anything, such as water or an adjustment of the temperature inside the jeep.  Several times, the agents told Defendant that they already knew the answers to their questions and were looking for the truth. Although Agent Stowers testified that the *Miranda* waiver form was in the vehicle and available to him at all times, he testified that the first time that Defendant was read his *Miranda* warnings was approximately one hour and five minutes into the interview.

The agents explained to Defendant that they were conducting an investigation into underage pornography.  Approximately twenty-two minutes into the interview, the agents told Defendant that they already had information, that they were there to obtain more information, that

---

[2] The first part of the interview was from 6:40 a.m. to 8:22 a.m.  Defendant was then escorted to the bathroom, and returned to the jeep for approximately twenty three minutes of additional questioning.  *See* ECF No. [29] at 2.

they wanted to know his perspective, and that what he said was "going to stay within this car." *Id.* at 22. Approximately twenty-six minutes into the interview, and after discussing Defendant's app usage and viewing of pornography, generally, Defendant told the agents that he "came across child pornography . . . on the page when [] scrolling." *Id.* at 24. Agent Suarez asked Defendant what, specifically, he saw, and told Defendant, "All we're here for specifically is the truth. So, whatever you want to give us, we're here to listen. So, try and explain the best way you can." *Id.* Defendant then admitted to the agents that he "actually bought some [videos of child pornography]." *Id.* at 26. Shortly after, Defendant told the agents that he re-sold a package of approximately ten child pornography videos. *Id.* at 28–29.

About forty-one minutes into the interview, Agent Stowers reminded Defendant again that he was not under arrest and that he did not have to answer any of their questions. Specifically, the following exchange occurs:

> Agent Stowers: Because yeah, bro, remember you're not under arrest. You don't have to answer questions. Okay? You can leave when you want, but I'm going to tell you that we're talking to Anthony, the other people are talking to him. So, if he says, "Yo, Jordan's the kingpin of this. He's the one that sells me the files," or he says, "Oh no, I gave this guy like"--
>
> Defendant: No, no, didn't –
>
> Agent Stowers: . . . "50 links . . ." You know what I mean?
>
> Defendant: One thing I'm not going to do is disrespect him because at the end of the day I could still go to jail any time. So it don't really matter . . . .
>
> Agent Stowers: I appreciate it. Yes. And I just want to . . . I'm being straight up with you that I'm not trying to trick you. I'm going to tell you straight up that we're going to talk to him, and if he's saying something different, then we have to figure out, you know, who's more truthful and who's lying. You know what I mean? So, in a federal investigation, it goes a long way, you know, when you're telling the truth . . . . Just be straight up, keep it real, and you know,

> we'll move along, and we'll get past it.  So, is Anthony the big
> kingpin here or you are?

*Id.* at 37.

After fifty minutes, the agents informed Defendant that they had more questions but asked

if they could take a break.  Defendant asked to use the restroom and about his job that he planned

to attend that day:

> Agent Stowers: Okay.  We want to ask you a couple more questions,
> but she needs to take a break.  Is that all right?  You need anything?
>
> Agent Suarez: You want water?
>
> Defendant: I've got to take a piss and um, what do I tell my job?
>
> Agent Stowers: Yeah, we'll tell them that you can't come to work
> today or you're going to be late.
>
> Defendant: Okay.
>
> Agent Suarez: Stay here.  I'll be right back.
>
> Agent Stowers: He's got to go to the bathroom . . . .
>
> Agent Suarez: Yeah.  Is there anything else you need? . . .
>
> Agent Stowers: You want a water or anything?
>
> Agent Suarez: You want some water?
>
> Defendant: I've just got to pee, that's all.
>
> Agent Suarez: We'll get you to that bathroom in a second.
>
> Agent Stowers: You need your phone to call?
>
> Defendant: Huh?
>
> Agent Stowers: You need your phone to call your job or do you
> know the number? . . . You have the number in your phone?

Defendant: So what's going to end up happening?  [I'm] going to get a fine and I have to pay something?  You want me to be truthful to you, you might as well just be truthful to me.

Agent Stowers: You're going to probably have more than a fine. This is, you know[], pretty serious.

Defendant: So this is going to be on my record?

Agent Stowers: Most likely, yeah.  What's the phone number for your job?

Defendant: I don't know . . . .

Defendant: So I'm going to have to go to court or something for this?

Agent Stowers:  Mm-hmm (affirmative), probably.

Defendant: Oh, my God.  Okay.  And that . . . okay.

Agent Stowers: Yeah, bro, you're selling child pornography.  It's kind of a big deal.  You know what I mean? . . . .

*Id.* at 45–47.

Approximately four-and-a-half minutes after Defendant first asked to use the restroom,

Agent Suarez returned and the following exchange occurs:

Agent Stowers: I mean, it's a long process in the federal system. You know what I mean?  You want to use the bathroom now?  Are we taking him in the bathroom?

Agent Suarez: Huh?

Agent Stowers: Are we taking him to . . . You got to use the bathroom?

Agent Suarez: I can take him to the bathroom.  Would you like to go to the bathroom?

Defendant: Yeah, we're coming back here?

Agent Stowers: Yeah.  Did I scare you?

> Agent Suarez: Unless you want to finish the conversation now, and then you'll be done.  It's up to you.
>
> Defendant:  All right.
>
> Agent Suarez: I have a couple more.
>
> Defendant: When we're done, do I leave?  Because as soon as we're done here, I've got to get ready.
>
> Agent Suarez: That's going to be up to . . . What we'll have to make sure [is] that everything's [good] to go as far as questioning and that we don't need anything else from you, and then we'll go from there. Do you want to finish the questioning or you want to go to the bathroom?
>
> Defendant: Let's finish the questions.
>
> Agent Suarez: Okay.

*Id.* at 47–48.[3]

Almost immediately after the above exchange, the agents provided Defendant his *Miranda*

warnings:

> Agent Suarez: So everything we already talked about, awesome information that you gave to us and I'm very appreciative [of] it, for real.  What I'm going to do now, only because we've been talking for so long and I just want to reiterate the fact that the things that you know, the things that you said to us was a voluntary statement regarding the questions that we asked.  So you've heard of your Miranda Rights, right?  You have the right to remain silent, all that good stuff?  Okay.  So before we continue, before you have to go to the bathroom, I'm going to read this to you really fast.  If you have any questions, you let me know.  We'll continue that way when you go to the bathroom, we can be done and then you never have to talk to me again.  Okay?  Even though I like talking to you.  Okay?  So

---

[3]   When asked about Defendant's request to go to the restroom, Agent Suarez testified that she gave Defendant "the option of either finishing the conversation or going to the bathroom, to which he wanted to finish the conversation before using the bathroom."  ECF No. [32] at 143:5–7.  Agent Suarez also read her response to Defendant's question regarding his work, that "we have to make sure that everything is good to go as far as questioning . . . ."  and testified that her statement meant that she "left it up to whoever was going to be in charge as far as the AUSA in their decision once everything was presented to them."  *Id.* at 144:9–13, 18–20.

before we're going to continue asking any questions, it's my duty to advise you of all the rights.

Defendant: Before we finish . . .

Agent Suarez: Yes, yes.

Defendant: Can y'all refer me to like a program, like . . .

Agent Suarez: For what?

Defendant: For mental issues.

Agent Suarez: Absolutely.

Agent Stowers: Yeah, you can ask the court . . . . You can ask for mental counseling.

Agent Suarez: Right now, unfortunately, I'm talking to you. I'll make sure that they tell him. I will absolutely do that for you. Okay? I don't want you to be suffering with any issues.

Defendant: There was an incident last week where Anthony actually abused me.

Agent Suarez: Okay. And what did he do?

Defendant: I got punched in the face . . . . He has a big anger problem.

Agent Suarez: Okay. So I also want to do this before I continue. What we say in this car, what you've told Special Agent Stowers and myself, you don't need to tell anybody else. For all he needs to know is, I didn't say anything. They kept asking me questions and I said nothing. You don't owe anybody any explanation. Right? Okay? Especially if someone's being abusive towards you. Okay? You understand? So you don't owe anybody an explanation. Okay? What you've told us stays here with us. Cool? Okay, so I'm going to finish this. I'll have you sign. And then if Special Agent Stowers has any other questions, if not, we'll take you to the bathroom and we'll be done. Okay?

Defendant: Okay.

Agent Suarez: So you have the right to remain silent. Anything you say can and be used against you in court or other proceedings. You

have the right to consult an attorney before making statement or answering any questions.  You have the right to an attorney present with you during any questioning.  If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  If you decide to answer questions now, you still have the right to stop the questioning at any time or to stop the questioning for purposes of consulting an attorney.  Yeah?  Did you hear those before?  Okay.  So you want him to sign?

Agent Stowers: Yeah.

Agent Suarez: Okay.

Agent Stowers: You're good with still talking to us, right Jordan?

Agent Suarez: Yeah? Okay.

ECF No. [29] at 50–51.[4]

Agent Suarez brought Defendant to the restroom.  *Id.* at 79.  Agent Stowers explained that Defendant was not detained when he was escorted to the restroom, stating that Defendant "could have left on his own and went to the bathroom down the street by himself" but had to be escorted in the house for safety reasons.  ECF No. [32] at 133:23–134:4.  According to the agents, Defendant asked to return to the vehicle to continue speaking with the agents after he used the restroom.  *Id.* at 130:8–10.

Following the conclusion of the interview, Agent Stowers testified that he brought Defendant back to the curtilage of the home and had Defendant sit down.  Several hours later, around 1:00 p.m., an agent spoke with someone from the U.S. Attorney's Office who authorized

---

[4] When asked what she meant by statements during the interview akin to "what is said in this car stays in this car," Agent Suarez testified that she meant she would not tell Anthony Lopez what was said because of Defendant's comment that Lopez had punched him in the face previously that week.  Agent Suarez also testified that her earlier comments to Defendant that what he said would stay with them was in relation to his romantic relationship status with Lopez.

Defendant's arrest.  Defendant was handcuffed, put in the same vehicle where he was questioned, and taken to the Federal Detention Center.

### III.    INSTANT MOTION

Defendant contends that all incriminating statements made in the course of the interview should be suppressed because the totality of the circumstances shows that Defendant was in custody such that *Miranda* warnings were required.  ECF No. [18] at 2–4.  Specifically, Defendant notes that (1) the search warrant was executed in a war-like manner with a significant show of force, (2) the interrogation took place in a police car, with one agent to his side and one directly behind him, (3) the Special Agents began the interrogation by asking whether he had ever been arrested, (4) the interrogation lasted more than two hours, (5) the Special Agents indicated to Defendant that he should inform his employer that he would not be coming into work, and (6) nearly one hour into the interrogation and after informing the Special Agents that he had to use the restroom, Defendant was told to wait to use the restroom.  *Id.* at 2–3, 5.

Second, Defendant argues that the fact that the Special Agents provided "*Miranda* warnings an hour into the interrogation does not cure their unlawful interrogation" because (1) Defendant had already made inculpatory statements, (2) the Special Agents' questions prior to the *Miranda* warnings "were designed to illicit incriminating responses," (3) the Special Agents had already "fully investigated" Defendant, and (4) the delayed *Miranda* warnings were "modified and inadequate" because of Agent Suarez's comment to Defendant that "what you've told us stays here with us."  *Id.* at 5–6 (emphasis removed).  Further, Defendant contends that he is entitled to "the *Missouri v. Siebert*, 542 U.S. 600 (2004) exception to admissibility of the post-*Miranda* statement."  *Id.*  at 8.  According to Defendant, "'the timing, setting and completeness of the pre-warning interrogation, the continuity of police personnel and the overlapping content of the pre-

and post-warning statements' . . . . weigh in favor of exclusion." *Id.* (quoting *United States v. Street*, 472 F.3d 1298, 1314 (11th Cir. 2006)).   Defendant thus contends that all statements, including those made post-*Miranda*, should be suppressed since "there was no break in time" nor an "explanation that the pre-warning statement would be inadmissible." *Id.* at 10.

In response, the Government argues that Defendant was neither under arrest nor in custody at the time of the interview.  ECF No. [24] at 4–5.  The Government argues that the Special Agents informed Defendant that he was not under arrest, Defendant voluntarily agreed to speak with the agents, and the door to the police vehicle was unlocked during the interview. *Id.* at 6.  Additionally, the Government notes that the agents "did not brandish their weapons" and did not act in an intimidating manner. *Id.* at 7.  The Government contends that the pre-*Miranda* warnings statements were voluntary and that Defendant's subsequent *Miranda* waiver was "knowing, voluntary, and intelligent." *Id.* at 8.  Moreover, the Government contends that even if the pre-*Miranda* warnings statements were inadmissible, "any statements given after *Miranda* are admissible as long as they are voluntary," And Defendant's statements were voluntary. *Id.* at 6, 8 (citing *Oregon v. Elstad*, 470 U.S. 298, 317–18 (1985)).  The Government contends that Defendant voluntarily waived his *Miranda* rights, verbally and in writing, and that "[t]here is no indication that the agents deliberately withheld reading of the *Miranda* warnings while attempting to elicit incriminating statements from Ewers." *Id.* at 6.

## IV.   ANALYSIS

Under the Fifth Amendment, "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In *Miranda v. Arizona*, the Supreme Court recognized that this privilege against self-incrimination extends to statements made during a "custodial interrogation," which cannot be used against a defendant in a criminal proceeding unless

he was first advised of his rights under the Fifth Amendment.  384 U.S. 436, 444 (1966).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"  *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983)).  The inquiry turns on "whether under the totality of the circumstances, a reasonable man in [the defendant's] position would feel a restraint on his freedom of movement . . . to such extent that he would not feel free to leave."  *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (internal citation and quotations omitted).  In addition to evaluating "whether an individual's freedom of movement was curtailed," courts ask "the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes v. Fields*, 565 U.S. 499, 509 (2012).

In evaluating whether an individual is in custody for purposes of *Miranda*, "[u]nambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor" that "generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'"  *Brown*, 441 F.3d at 1347 (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)) (emphasis in original).  Although not dispositive, "[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  *Id.* at 1348 (internal citation and quotations omitted) (emphasis omitted).  Other factors include the length of the detention and "whether officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance" could be compelled.  *United States v. Luna-Encinas*, 603 F.3d 876, 881

(11th Cir. 2010) (internal citation and quotation marks omitted).  Courts may also consider "the release of the interviewee at the end of the questioning."  *Howes,* 565 U.S. at 509.

Moreover, when an individual is subject to custodial interrogation and provides incriminating statements to officers before receiving *Miranda* warnings, but then is subsequently read *Miranda* warnings and provides further incriminating statements, the later statements will generally be admissible provided that the post-*Miranda* statements were knowingly and voluntarily made.  *Oregon v. Elstad*, 470 U.S. 298, 1309 (1985).  "In making this determination courts are not to presume that the existence of the earlier unwarned statement compelled the defendant to give another one, but instead should assume that ordinarily giving proper *Miranda* warnings removes the effect of any conditions requiring suppression of the unwarned statement." *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006) (citing *Elstad*, 470 U.S. at 314). However, such post-*Miranda* statements are inadmissible where the questioning officer intentionally circumvents *Miranda* and fails to provide sufficient curative measures.  *Missouri v. Seibert*, 542 U.S. 600, 622 (2004).

> **A.   Defendant Was Not In Custody, and Therefore, His Statements Are Admissible.**

As an initial matter, there is no dispute that Defendant was told at the beginning of his interview that he was not under arrest, that he was under no obligation to answer any questions, and that he was free to leave.  Specifically, Defendant was told: "[y]ou're not under arrest, okay? You're not under arrest.  You don't have to answer questions if you don't want to.  You're free to leave whenever you want to, okay?  Um, you can answer questions you want to, or you can say, 'Hey, I don't want to answer that.'"  ECF No. [29] at 4.  The same was repeated about forty-one minutes into the interview, when Agent Stowers said to Defendant, "[b]ecause yeah, bro, remember you're not under arrest.  You don't have to answer questions.  Okay?  You can leave

when you want, but I'm going to tell you that we're talking to Anthony, the other people are talking to him." *Id.* at 37. This is critical as such advisement "generally will lead to the conclusion that the defendant is *not* in custody," unless there were "restraints that are 'so extensive that telling [Defendant] he was free to leave could not cure the custodial aspect of the interview.'" *Brown*, 441 F.3d at 1347 (citing *Muegge*, 225 F.3d at 1271) (emphasis in original). As such, the inquiry here turns on whether the restraints were so extensive that they amounted to custodial interrogation despite the clear and unequivocal statements from the agents that he was free to leave, not under arrest, and not required to answer any question. To be sure, Defendant is correct that the manner in which the warrant was executed cannot be separated from the interview. *See* ECF No. [33] at 5. However, it must be considered with all the other factors, including circumstances of the interview itself.

In reviewing the totality of the circumstances, the Court finds that the restraints here, although not insignificant, were not "so extensive" as to render the interview custodial as defined by *Miranda* and its progeny. First, although Defendant was handcuffed when the warrant was executed, this was done for officers' safety and the cuffs were removed before the agents approached him for an interview. *See United States v. Thomas*, 193 Fed. App'x. 881, 886 (11th Cir. 2006) (unpublished) (finding no error in denial of motion to suppress where "Thomas was handcuffed immediately after arriving at her home [but] the handcuffs were removed before [the officer] questioned Thomas, and, significantly, he informed Thomas that she was not under arrest."). In short, Defendant was not handcuffed either when asked if he wanted to speak to the agents or at any time during the interview.

Second, the agents that approached Defendant to see if he was willing to talk did not have their weapons drawn and did not touch him in any way. *See United States v. Maldonado*, 562 Fed.

App'x. 859, 860–61 (11th Cir. 2014) (unpublished) (the fact that officers "did not brandish their weapons when they first approached Maldonado . . . or later during the interview" weighed against finding custody). Specifically, the evidence is that he voluntarily walked with the agents to their car, and indeed, even returned to talk to them after he was given his *Miranda* warnings. Although there had been a show of force at the time the warrant was executed, Defendant had been sitting outside of the home for about thirty minutes before he was even approached by the agents.

Third, the demeanor and tone of the officers throughout the interview was fairly pleasant and non-confrontational. The interview, which was recorded, does not show abusive language or conduct that would render the words that were uttered by the agents (i.e., that he was free to leave) unconvincing. *See Luna-Encinas*, 603 F.3d at 881 (noting that tone of the officer during the interview is one factor to consider). Indeed, the agents assisted Defendant in calling his work, offered him water, and allowed him to use the bathroom. Although he was accompanied to the bathroom, that was also for safety reasons given that the bathroom was inside the home and the search of the home continued.

Finally, although Defendant was not interviewed inside the house, a more familiar or neutral setting than an unmarked police vehicle, this fact is not sufficient to sway the analysis. *See Maldonado*, 562 Fed. App'x. at 860 (finding "familiar . . . surroundings" that weighed against finding custody where the defendant was interviewed at her workplace, "inside a supervisor's office with the door closed"). Indeed, the other occupants were all still outside of the house while he was being interviewed, the car was unmarked, Defendant sat in the front seat, and the car was unlocked. Defendant cites to *United States v. Acosta* in support of his argument that the setting of the interview in a police vehicle weighs in favor of custody. ECF No. [33] (citing 363 F. 3d 1141, 1148 (11th Cir. 2004)). But in *Acosta*, the same privacy and officer safety considerations were not

at issue.  In *Acosta*, the defendant was stopped and questioned in a parking lot during the day. *Acosta*, 363 F.3d at 1150.  Here, the house was being searched during the time that Defendant was interviewed and the yard, which appeared to be small based on the evidence presented, would have offered no privacy given the number of occupants that were sitting outside waiting for the search of the house to be completed.  Thus, the fact that the Court considered in *Acosta* that the defendant "was not even placed in a police car" to weigh against a finding of custody does not mean one is in custody merely because they *are* placed in a police car.  Moreover, like *Acosta*, no weapons were drawn, Defendant was not subject to physical restraint, and was not handcuffed during the interview.  *Id.*  In short, the Court sees no indication that he was taken to the unmarked police car as any type of coercive tactic.

The undersigned notes that *United States v. Matcovich*, an unpublished opinion from the Eleventh Circuit, is also persuasive to the analysis.  There, officers conducted a search warrant at a boarding house where the defendant had lived for the past six years.  522 Fed. App'x. 850, 852 (11th Cir. 2013).  During the initial entry of the search warrant, "there was a 'police-dominated atmosphere' with a number of officers handcuffing residents and bringing them to a central location."  *Id.*  At approximately 6:30 a.m., the officers knocked on the door and announced their presence and the warrant and entered through the open door when no one answered.  *United States v. Matcovich*, No. 2:12-CR-7-FTM-29DNF, 2012 WL 2115444, at *1 (M.D. Fla. May 7, 2012), *report and recommendation adopted*, No. 2:12-CR-7-FTM-29DNF, 2012 WL 2115490 (M.D. Fla. June 11, 2012), *aff'd*, 522 Fed. App'x. 850 (11th Cir. 2013).  There were approximately eight officers on scene, and they were "dressed in ballistic vests and raid gear" as well as "badges and firearms."  *Id.* at *2.  When cuffing the residents, officers told them that it was for officer safety.  *Matcovich*, 522 Fed. App'x. at 852.  Shortly after, the officers removed the handcuffs and informed

23

the residents that they were not under arrest.  *Id.*  One of the officers asked the defendant if he would be willing to speak with the officer, and the defendant agreed.  *Matcovich*, 2012 WL 2115444, at *3.  The officer and the defendant went into one of the bedrooms of the residence, and "the first statement [the officer] made was to tell the Defendant he was free to leave, and the Defendant did not ask to leave."  *Id.*  The interview lasted three hours and the defendant was not permitted to go into his room due to officer safety concerns during the search warrant execution, although an officer retrieved cigarettes for him from his room.  *Matcovich*, 522 Fed. App'x. at 852.  When the defendant used the restroom, he had to leave the door slightly open due to officer safety concerns.  *Id.*

The Eleventh Circuit found that the defendant was not in custody, despite recognizing a "number of factors that suggest the interview was custodial . . ."  *Id.*  Specifically, the Eleventh Circuit considered that the "police-dominated atmosphere" and restriction on movement related to the defendant's bedroom and using the restroom were factors that suggested custody, but ultimately were explained as security necessities.  *Id.*  The Eleventh Circuit determined that such factors could not constitute custody when considered under the totality of the circumstances, including that: (1) the defendant was unambiguously told he was not in custody and could leave or refuse to answer questions; (2) the defendant was in his home, a familiar setting; (3) the defendant was not physically restrained during the interview; (4) the agents' weapons were holstered; (5) the defendant was permitted to "go outside and smoke and move about the house to get dressed and make coffee," albeit while being accompanied by an officer for safety reasons; (6) the agent did not convey his suspicion of [the defendant as a suspect]; and (7) the defendant "left voluntarily with an FBI polygrapher and was not arrested until a later time."  *Id.*

Here, the manner in which the warrant was executed happened almost forty minutes before any agent approached Defendant regarding an interview.  Once the agents approached him, he was told that he could leave, he was not under arrest, and he did not have to answer questions.  He was interviewed in a car that was parked in front of the home where he was living, he was not physically restrained, the agents had their weapons holstered the entire time of the interview, the agents allowed him to use the restroom and helped him make a call to his employer, and he was allowed to leave and go back with the other occupants of the home when the interview concluded.  As such, even though the manner in which the warrant was executed and the fact that Defendant was taken into a police car to be interviewed might be factors that tend to support a custodial interview, in this context, the Court finds that Defendant was not in custody at the time of his interview such that statements made before he was advised of his *Miranda* rights should be suppressed.

**B. Defendant's Post-*Miranda* Statements Are Admissible.**

Should the District Court not adopt the undersigned's recommendation that Defendant was not in custody at the time that the interview began, the undersigned separately analyzes Defendant's argument that the *Miranda* warnings that were provided approximately one hour and five minutes into the interview "were deficient when they were undermined by conflicting contemporaneous statements" by Agent Suarez that what was said during the interview would stay in the vehicle and that "the agents used an intentional two-step strategy to undermine the protections of Miranda."  ECF No. [33] at 7.  The Government argues that "Ewers was read his rights from the Statement of Rights form, he indicated he understood his rights he then signed the form waiving those rights" and that "[t]here is no indication that the agents deliberately withheld reading of the *Miranda* warnings while attempting to elicit incriminating statements from Ewers."  ECF No. [34] at 6.

When a defendant gives a statement before receiving his *Miranda* rights, and then is subsequently advised of his *Miranda* rights and gives additional statements, the admissibility of the statements made post-*Miranda* warnings is governed by *Oregon v. Elstad*, 470 U.S. 298 (1985) and *Missouri v. Seibert*, 542 U.S. 600 (2004).  In *Elstad*, the defendant was subject to a custodial interrogation in his home and confessed before receiving his *Miranda* warnings.  *Elstad*, 470 U.S. at 301.  Approximately one hour later, the officers transported the defendant to the police station and read him his *Miranda* warnings.  *Id.*  The defendant voluntarily waived his rights and gave additional incriminating statements.  *Id.*  The Court determined that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made."  *Id.* at 302.  Thus, the general rule set forth in *Elstad* is that if the statement made after *Miranda* warnings is knowing and voluntary, then the statement is admissible.  *Street*, 472 F.3d at 1312 (citing *Elstad*, 470 U.S. at 309).

However, there is an exception to this general rule.  In *Seibert*, the defendant was arrested and "taken to the police station and left alone in an interview room for 15 to 20 minutes."  542 U.S. at 604.  An officer began to interview her without reading her *Miranda* warnings, on the specific direction of another officer.  *Id.*  After thirty to forty minutes, the officer gave the defendant a twenty-minute break, and then returned and gave the defendant her *Miranda* warnings.  *Id.*  The defendant waived her rights and the interview continued, with the officer confronting her with the statements made pre-*Miranda* warnings.  *Id.*  The Court held that the defendant's statements made after receiving her *Miranda* warnings were inadmissible because the officer engaged in a technique whereby he circumvented *Miranda* by obtaining the confession first and

then providing her *Miranda* warnings to obtain the confession again.[5]  *See id.* at 618.  As such, under the analysis in *Seibert*, statements must be suppressed if police utilize the "question-first," or "two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning." *Id.* at 622.

Based on this record, the undersigned finds that Defendant's post-*Miranda* warnings statements were voluntary.  The agents did not threaten or coerce Defendant, Agent Suarez read the *Miranda* warnings verbatim, and Defendant signed a waiver form.  In reviewing the transcript and recording of the interview, Agent Suarez's comments that Defendant cites to clearly pertained to whether Anthony Lopez or Defendant's family would find out about Defendant's statements. Indeed, having considered the statements made in the context of the interview, the Court cannot find that they were made to coerce Defendant's statements.

Additionally, the record here does not support a finding that the agents engaged in "question first" tactics to circumvent the protections of *Miranda*.  Although Agent Stowers and Agent Suarez confirmed that they sought incriminating statements from Defendant, Agent Stowers also testified that the plan was specifically to conduct a non-custodial interview.  Moreover, the interview itself does not support the finding that the agents were trying to illicit a confession, and then issued *Miranda* warnings to have Defendant repeat his incriminating statements.  Unlike *Seibert*, the post-*Miranda* warnings part of the interview in no way "resembled a cross-examination." *Id.* at 621.  Although the entire interview focused on the investigation and Defendant's selling of child pornography, the agents, for example, did not ask Defendant to repeat his prior incriminating statements after they read him his *Miranda* warnings.  In short, a review of

---

[5] "Because *Seibert* is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law." *Street*, 472 F.3d at 1313 (citing *United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1136 n.6 (11th Cir. 2006)).

the interview and the statements simply does not support a finding that the agents were using "questions first" tactics.

The facts here are in stark contrast to the case Defendant relies on, *United States v. Harris*. There, the Court found that officers employed "question first" tactics where they "knew that they would be arresting the Defendant when they found him," handcuffed the defendant, and "intentionally and deliberately drove the Defendant to his mother's home to question him in front of her."  No. 12-60026-CR, 2012 WL 1941584, at *2 (S.D. Fla. May 29, 2012) (unpublished). Accordingly, this Court held that the *Harris* interview was "a deliberate custodial interrogation of a Defendant in an environment chosen by law enforcement because of the likelihood it would exert pressure on the Defendant to incriminate himself."  *Id.* at *6.  In particular, the Court "did not find credible the assertion that the agents took the Defendant back to his mother's home because they needed her to confirm his identity" but "instead was a calculated interrogation tactic."  *Id.*  The facts here simply do not support a finding that Defendant was not given *Miranda* warnings as a calculated technique.   As such, if the District Court were to reject the Report and Recommendation's finding that Defendant was not in custody at the time of his statements, the statements before he was given *Miranda* warnings should be suppressed but those given after should be admitted.

## IV.    CONCLUSION

For the reasons set forth above, it is hereby **RECOMMENDED** that Defendant's Motion to Suppress, ECF No. [18], be **DENIED**.

## V.    OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, within **SEVEN** calendar

days of being served with the Report and Recommendation.  Any response to another party's objections must be filed within **THREE** days after being served with a copy thereof.  Any request for an extension of these deadlines must be made within **THREE** calendar days from being served with the Report and Recommendation.  The parties were given ample time to argue their positions at the hearing, as well as the opportunity to submit supplemental briefing, and the shortened period will allow for the District Court to consider the matter before the Calendar Call now set for May 19, 2022.  Pursuant to Fed. R. Crim. P. 59(b), Eleventh Circuit Rule 3-1, and accompanying Internal Operating Procedure 3, the parties are hereby notified that failure to object in accordance with 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

      **DONE AND SUBMITTED** in Chambers at Miami, Florida, on May 2, 2022.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**